NOT DESIGNATED FOR PUBLICATION

No. 114,715

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

GERALD J. MADKINS, III,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; CHRISTOPHER H. MAGANA, judge. Opinion filed March 31, 2017. Affirmed.

*Ryan Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., HILL, J., and WALKER, S.J.

*Per Curiam*: Gerald J. Madkins, III, asks us to overturn his convictions for six violent crimes. He attacks his convictions in three ways:

- The judge failed to answer a jury question properly;
- the court should not have admitted evidence of prior incidents between himself and the victim, and failed to give a limiting instruction after admitting this evidence; and

1

- his rape conviction must be reversed for lack of evidence.

Our review of the record leads us to conclude the judge did answer the jury's question properly. The error concerning the admission of prior bad acts evidence was harmless. And, we decline Madkins' invitation to reweigh the rape evidence on appeal. Accordingly, we affirm his convictions.

*Madkins savagely attacked his victim.*

L.D., the victim, began living with Madkins in Wichita during the summer of 2014. After some friends left to go to a movie, Madkins went into the kitchen and L.D. stayed seated on the couch, playing on her phone. Madkins returned from the kitchen and called L.D. "a bitch, a whore, [and] tramp," and accused her of cheating.

L.D. reached for her purse, but Madkins pulled it away from her. Madkins retrieved additional cell phones from her purse. L.D. had multiple cell phones because the memory cards contained pictures she wanted to keep. When Madkins pulled the phones out of her purse, he threw them and some of them broke. While breaking the phones, Madkins told L.D. that she would have no one to call for help.

L.D. tried to leave, but Madkins told her that she could not leave. L.D. went to her closet to gather her things. While L.D. was at her closet, Madkins approached her from behind and began choking her. While Madkins was choking L.D. he told her to promise him that she would "be a good bitch," and that he would kill her and get away with it.

L.D. passed out while Madkins was choking her. When she woke up, she began to get up and leave the house. Madkins punched her on the left side of her face, and then kicked her in the back and in her face. L.D. plead to Madkins to let her go, and Madkins

2

told her she could leave after she picked up the mess he caused by throwing things out of her purse.

When L.D. began to pick items off the floor, Madkins jumped on top of her holding a pocketknife. Prior to jumping on top of L.D., Madkins tried to stomp on her twice but L.D. moved out of the way. Madkins held the knife to L.D.'s face and asked if she was ready to die. Madkins swung the knife at L.D., and while attempting to push the blade away, L.D. cut her finger. Madkins threw the knife behind him on the floor.

Madkins began choking L.D. again, calling her names and stating no one would miss her. While this was occurring, L.D. bit her tongue from trying to scream. L.D. fell unconscious again. When she regained consciousness, Madkins punched her on the right side of her face. Madkins then choked L.D. for a third time and again she lost consciousness.

After she woke up, Madkins dragged L.D. outside of the house. While dragging her outside Madkins stated that "no one would help a whore, no one would help a bitch." Madkins then dragged L.D. back into the house. Madkins pushed L.D. onto a couch and told her she could leave after doing one thing for him. Madkins then took off his pants and put his penis in her mouth. L.D. did not want to perform oral sex on Madkins.

This went on for 5 to 10 minutes, after which Madkins told L.D. to take off her clothes. L.D. did not want to take her clothes off and a struggle occurred. Madkins succeeded in taking off L.D.'s clothing and then put his penis in her vagina. After 5 to 10 minutes, he placed his penis back into L.D.'s mouth. After an additional 5 to 10 minutes, Madkins let L.D. go.

Eventually, L.D. ran to a hospital 4 to 5 blocks from the house. While at the hospital the police were called. L.D. was described as hysterical prior to explaining to the

3

police what occurred. After calming down, L.D. was able to describe what happened. L.D. informed the police of what had occurred—the details of her story were substantially similar to the above facts.

At the hospital L.D. was also examined by a nurse. The nurse observed swelling, bruising, and redness on L.D.'s face. There was swelling, redness, and abrasions along L.D.'s neck. Abrasions, redness, and bruising was present on L.D.'s right breast. L.D. had bruising and swelling on her knees. The nurse examined L.D.'s vagina, but did not find any trauma or injuries.

The nurse testified that it is common to not find genital damage in instances of rape. The nurse collected swabs from various areas of L.D.'s body, including her mouth, neck, and genitals. Eventually, the swabs from L.D.'s genitals were tested for the presence of blood and semen, but they were negative.

A police officer took photographs of L.D.'s injuries. The photographs showed L.D. had an injury to both sides of her tongue, redness consistent with being choked on her neck, red bruising and swelling around her eye, a discolored region on her back consistent with bruising, and a centimeter-long laceration on her right index finger.

Other officers were dispatched to Madkins' house. When Madkins answered the door he was wearing only a pair of boxer-briefs and socks. Madkins allowed the officers into his home. One of the officers asked Madkins to put on clothes and step outside to talk with him. Madkins put on a pair of pajama pants, but refused to leave the house. Inside the house, an officer noticed liquid spilled on the floor and trash scattered around the room. Additionally, there was a folding knife located on a television stand and a broken cell phone partially under the television stand. A pair of pants which matched the description of the pants Madkins was wearing earlier in the night were located in the room where the incident had taken place.

4

The officer noticed a fairly strong odor of alcohol on Madkins' breath and that he had trouble with his balance. Madkins asked the officer what his reason for being at the house was and the officer only responded that he was responding to a call. Madkins became upset and said that "she" must have called, but did not state who he meant by "she." Madkins began to provide information to the officer without being prompted by any questions.

Madkins told the officer he had walked into the house and saw L.D. with another man, and he and L.D. got into an argument. Madkins then told L.D. to leave the residence, and L.D. told Madkins she was going to call the police. Madkins also stated that if L.D. had been cut, it was self-inflicted. The officer then arrested Madkins.

Madkins was subsequently taken to the hospital to collect his DNA following the issuance of a warrant directing its collection. A nurse at the hospital swabbed Madkins' penis. The swabs from Madkins' penis tested positive for the presence of saliva and semen. DNA consistent with Madkins and L.D. was located on Madkins' penis.

*The State charged Madkins with six violent crimes.*

The State charged Madkins with aggravated kidnapping, rape, aggravated criminal sodomy, aggravated assault, aggravated battery, and aggravated robbery. Prior to trial, the State filed a motion to admit evidence of prior violent incidents between Madkins and L.D. under K.S.A. 2014 Supp. 60-455. The State argued the purpose for admitting this evidence was to show identity, modus operandi, lack of self-defense, or lack of mistake. The district court admitted the evidence.

At trial, L.D. testified about the prior incidents between her and Madkins over Madkins' objection. In one of the incidents, Madkins came home from work and had been drinking. Madkins was angry that L.D. did not pick up her phone when he called. He

5

began shoving L.D. and calling her a bitch, whore, and lying cunt. During this incident, Madkins hit and shoved L.D. but did not do anything of a sexual nature to her. The second incident occurred on a friend's birthday. Seemingly without a catalyst, Madkins began throwing beer cans at L.D. and called her a bitch, slut, and tramp. Both incidents took place a few weeks prior to the incident at issue.

After the jury began deliberations, it had a question for the court. The jury asked whether hands could be considered a deadly weapon. After conferring with both counsel for the prosecution and defense, with Madkins present, the court asked counsel if they were in agreement to respond by referring the jury to the instruction for the definition of deadly weapon. Defense counsel requested that the court respond to the question in the negative but had no objection to referring the jury to the jury instruction.

The jury found Madkins guilty of aggravated kidnapping, rape, aggravated criminal sodomy, aggravated assault, the lesser included crime of robbery, and aggravated battery. Additionally, the jury found all of the crimes were crimes of domestic violence. Madkins was sentenced to a controlling 620-month prison term.

*We find no error in how the court handled the jury question.*

Before we address the issue, we must decide if this is invited error and, thus, unreviewable. The State claims any error was invited error due to Madkins acquiescing in the method the district court used to answer the question. We are not so convinced.

Acquiescence to the court's proposed answer to the jury question is not enough to invoke the invited error rule for jury questions. When we contrast *State v. Bruce*, 255 Kan. 388, 396-98, 874 P.2d 1165 (1994), where the court found that invited error applied when defense counsel answered "absolutely" to the court's proposed answer, with *State v. Lewis*, 299 Kan. 828, 855, 326 P.3d 387 (2014), where the court decided that "some

6

indication" of acquiescence in the record was not sufficient to invoke the invited error rule, we hold this case is more like *Lewis* than *Bruce*.

After all, the purpose of the invited error rule is to "curtail[] manipulative tactics inducing trial courts to make mistakes that otherwise might require reversal of an adverse verdict." *State v. Hargrove*, 48 Kan. App. 2d 522, 553, 293 P.3d 787 (2013). This record does not indicate that defense counsel was trying to manipulate the district court into committing reversible error because defense counsel actually wanted to answer the question in the negative. We will reach the merits of the question.

This is a matter of discretion. *Lewis*, 299 Kan. at 856. To the extent we must determine whether the response given by the court is a correct statement of law, the review is de novo. *State v. Wade*, 295 Kan. 916, 921, 287 P.3d 237 (2012).

The response the district court gave the jury was to refer back to jury instruction No. 10, which stated:

> "A deadly weapon is an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury. An object can be a deadly weapon if the user intended to convince a person that it is a deadly weapon and that person reasonably believed it to be a deadly weapon."

This language is directly from the pattern instructions, PIK Crim. 4th 54.280. The use of PIK instructions is recommended because they correctly state the law. See *State v. Gallegos*, 286 Kan. 869, 878, 190 P.3d 226 (2008). Because the response was to refer back to a PIK instruction, the response correctly stated the law.

Next, the inquiry turns to whether the district court abused its discretion. The district court's decision should be overturned if the answer is arbitrary, fanciful, or

7

unreasonable. *Wade*, 295 Kan. at 920. When the jury raises a question during deliberations the district court has a duty to answer the question in some meaningful way. *State v. Boyd*, 257 Kan. 82, 88, 891 P.2d 358 (1995). The Kansas Supreme Court specifically permits courts to refer juries back to the original instructions if the answer to the question is adequately covered by those instructions, or if the questions are irrelevant. *State v. Bandt*, 219 Kan. 816, 823-24, 549 P.2d 936 (1976).

In an unpublished case, a panel of this court recently held the district court failed to provide a meaningful answer to a similar question by referring the jury back to the jury instructions. *State v. Vaught*, No. 109,425, 2015 WL 4460205, at *1 (Kan. App. 2015) (unpublished opinion). The specific question in *Vaught* was, "'Count 3[.] Is the charge asking that the deadly weapon is the gun? [O]r can you count the defendant[']s hands as a deadly weapon?'" 2015 WL 4460205, at *3. The majority of the panel held the district court abused its discretion by referring the jury back to the instructions. 2015 WL 4460205, at *4.

The dissent in *Vaught* did not take issue with the district court's answer. 2015 WL 4460205, at *9. The dissent viewed the jury's question more as a "'we have an interesting question'" than a serious indication that it was considering the hands to be a deadly weapon. 2015 WL 4460205, at *9. The dissent essentially invoked the exception from *Bandt* for irrelevant questions. See 219 Kan. at 823.

In our view, the question of whether hands are a deadly weapon is irrelevant to the ultimate determination for the jury in this case. The charging document and the State's arguments at trial clearly show the theory of the case for the assault charge was for attacking L.D. with a knife.

Actually, the question in *Vaught* was broader than the question here. In *Vaught*, the jury asked both "[i]s the charge asking that the deadly weapon is a gun," and "can you

8

count the defendant[']s hands as a deadly weapon?" 2015 WL 4460205, at *3. Here, the jury only asked whether hands could be considered a deadly weapon. In *Vaught*, answering the first half of the question—that the State was alleging the gun was the deadly weapon—answers the second half of the question—hands are not the deadly weapon in the case. The two questions in *Vaught* tend to show that the jury was confused on how to apply the law. Here, there was only one question about whether hands can be deadly weapons. Thus, it is less likely the jury was actually confused and instead was asking an irrelevant question. See *Bandt*, 219 Kan. at 823.

To sum up, referring the jury back to the instruction defining a deadly weapon, which accurately states the law, adequately answered the jury's question. Thus, the district court did not abuse its discretion because the jury's question was irrelevant. There is no reversible error here.

*The admission of prior bad acts evidence with no limiting instruction was erroneous, but harmless.*

Clearly, evidence of prior bad acts cannot be admitted to show a criminal defendant's propensity to commit the current crime. K.S.A. 2014 Supp. 60-455(a). But such evidence can be used to prove some other material fact. K.S.A. 2014 Supp. 60-455(b). The statute provides a nonexclusive list of facts for which prior bad acts evidence can be used. *State v. Vasquez*, 287 Kan. 40, 51, 194 P.3d 563 (2008). Prior bad acts can be used to prove a defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or lack of mistake or accident. K.S.A. 2014 Supp. 60-455(b).

When we review the admission of evidence of prior bad acts, we use a four-step process. We consider materiality, whether the proved fact is disputed, the relevance of the evidence, and whether it is more probative than prejudicial. First, the court reviews whether the evidence is material. Material means the evidence "has a legitimate bearing

9

on the decision of the case." *State v. Garcia*, 285 Kan. 1, 14, 169 P.3d 1069 (2007). In the context of prior bad acts, the question is whether the evidence proves one of the facts listed in the statute or some other nonpropensity material fact. As this is a question of law, our standard of review for materiality is de novo. *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008).

Second, in order for the evidence to be admissible, the material fact must be disputed. *Garcia*, 285 Kan. at 14.

Third, as with all evidence, the prior bad acts evidence must be relevant to the case. *Reid*, 286 Kan. at 505. According to K.S.A. 60-401(b), evidence is relevant if it provides any tendency in reason to prove a disputed fact. We therefore review the district court's determination of relevance for an abuse of discretion. *Reid*, 286 Kan. at 507.

Finally, if there is a material, disputed fact which is supported by relevant evidence, the evidence may be excluded if the probative value of the evidence is outweighed by the prejudicial effect of the evidence. *Reid*, 286 Kan. at 503. When reviewing the district court's weighing of the evidence, this court reviews for an abuse of discretion. *Garcia*, 285 Kan. at 18.

Additionally, if the prior bad acts evidence is admissible, the district court is required to provide the jury with a limiting instruction to prevent the evidence being used for an impermissible purpose. *Garcia*, 285 Kan. at 12. Both questions—the admission of the evidence, and whether the error of not providing a limiting instruction—are also reviewed for harmlessness.

Here, the evidence concerned two altercations involving Madkins being intoxicated, yelling at L.D., and shoving her. At a pretrial conference, the State asked for

10

the evidence to be admitted to show identity, relationship of the parties, modus operandi, lack of mistake, and lack of self-defense.

We look first to see whether the evidence is material. The trial court ruled the evidence was material in that it potentially showed identity but was more relevant to lack of mistake or modus operandi.

Identity can be a sufficient basis for the admission of prior bad acts evidence. K.S.A. 2014 Supp. 60-455(b). Madkins claims identity is not a disputed material fact here. Although Madkins does not contest that he was at the house on that night, Madkins does contest that he committed the crimes. The use of prior bad acts to prove identity is not appropriate when "a defendant admits that he committed the act and his presence at the scene of the crime is not disputed." *State v. Bly*, 215 Kan. 168, 176, 523 P.2d 397 (1974), *overruled on other grounds by State v. Mims*, 220 Kan. 726, 556 P.2d 387 (1976). Because Madkins told the police that L.D. had fabricated the event, his identity is a material and disputed fact. See *Garcia*, 285 Kan. at 14.

Next, we look at the relevance of the evidence. When determining the relevance of prior acts to prove identity, there should be some evidence of the underlying facts showing the manner in which the other offense was committed to raise a reasonable inference that the same person committed both offenses. *Garcia*, 285 Kan. at 15. Here, there are similarities between the events. In the prior acts, Madkins called L.D. names which implied infidelity and in one instance became physical with L.D.

The prior bad acts only need to be sufficiently similar and not identical to each other. See *State v. Searles*, 246 Kan. 567, 578, 793 P.2d 724 (1990). It is reasonable to infer that based upon Madkins' actions in the prior incidents that he was the one who committed the present crime. See *Garcia*, 285 Kan. at 15. The probative value of showing Madkins had previously acted in such a way went to show that it was he who

11

committed these acts. This probative value outweighs the potential prejudice of improper propensity inferences. The district court did not abuse its discretion by finding the evidence relevant and admitting the evidence.

We turn to the second phase of our inquiry, which concerns the failure to give a limiting instruction. The Kansas Supreme Court has routinely held that admitting prior bad acts evidence without a limiting instruction is an error by the district court, even when such an instruction is not requested. See, *e.g.*, *State v. Gunby*, 282 Kan. 39, 59, 144 P.3d 647 (2006). But that does not mean that the error is automatically reversible. 282 Kan. at 57. The error should not be reversed if the error is harmless. On appellate review, an error should be considered harmless if the reviewing court is convinced that in the absence of the error, the jury would have reached the same conclusion. *State v. Cooperwood*, 282 Kan. 572, 581, 147 P.3d 125 (2006).

Our review of the record reveals that the evidence in this case supports our conclusion that the jury would have reached the same verdict had the limiting instruction been given. L.D. testified about her experiences that happened on that night. L.D.'s testimony was corroborated by the physical evidence. A police officer and a nurse testified and showed the jury pictures of the injuries Madkins inflicted on L.D. Additionally, a police officer found spilled beer and trash in Madkins' house, which was consistent with the story L.D. gave to the police. A knife, matching the description of the knife with which L.D. said she was attacked, and a broken cell phone, matching the description of the phone L.D. stated Madkins had thrown and broken, were found in the room the incident took place. The DNA evidence tended to corroborate L.D.'s version of the events. Based upon all of the facts, any possibility of the jury impermissibly using the prior bad acts as propensity evidence is vastly outweighed by the direct evidence the State presented. Therefore, there is not a real possibility the verdict would have changed had the limiting instruction been given. See *Cooperwood*, 282 Kan. at 581.

12

A reasonable juror could have found Madkins guilty beyond a reasonable doubt without making any impermissible propensity inference. Additionally, we note that the jury in fact convicted Madkins of the lesser-included robbery charge. This indicates that the jury did not make an impermissible propensity inference. In light of all of the evidence presented by the State, any error for not providing a limiting instruction was harmless.

*The evidence supports a conviction for rape.*

Madkins contends that there was insufficient evidence to convict him of rape. He asks us to reverse his rape conviction by making a determination that L.D.'s testimony was not credible in light of the evidence, and to reweigh the DNA evidence.

Our standards dealing with such questions are well established. In reviewing the sufficiency of the evidence, we consider the entirety of the evidence in the light most favorable to the prosecution and ask whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). In so doing, we will not reweigh evidence or make determinations of witness credibility. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

While it is true that in rare cases a witness' testimony may be so incredible that no reasonable factfinder could find guilt beyond a reasonable doubt based upon the testimony, we see no reason here to resort to that step. See *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

Specifically, Madkins asserts L.D. was not credible due to claiming he was extremely violent on the night of the incident and there was no evidence of trauma to her vagina. This lack of trauma, Madkins claims, provides reasonable doubt about penetration. This assertion ignores the evidence from the nurse who performed L.D.'s

13

examination, who testified that it is common in cases of rape that no trauma to the vagina is present.

In our review of the whole record in the light most favorable to the State, a reasonable juror could conclude Madkins penetrated L.D.'s vagina without causing injury.

Concerning the DNA evidence, Madkins claims that L.D.'s DNA was on his penis due to consensual sex 12 hours prior to the incident establishes a reasonable doubt. Accepting this contention would require this court to reweigh the evidence, because two reasons were presented for L.D.'s DNA being on Madkins' penis—Madkins' claim of consensual sex and L.D.'s story of forced penetration. Based on the evidence in the light most favorable to the State, a reasonable juror could conclude that L.D.'s DNA was present on Madkins' penis due to the forcible penetration L.D. described. Neither L.D.'s testimony concerning the events, nor the DNA evidence, is so incredible that no reasonable factfinder could find the defendant guilty beyond a reasonable doubt. See *Matlock*, 233 Kan. at 5-6.

As it was charged in this count, to prove rape, the State had to prove that Madkins knowingly engaged in sexual intercourse with a victim who did not consent to the sexual intercourse when the victim is overcome by force or fear. See K.S.A. 2014 Supp. 21-5503. L.D. testified that she did not consent or want Madkins to put his penis in her vagina. When he did so, this penetration satisfied the sexual intercourse requirement. See K.S.A. 2014 Supp. 21-5501(a). The evidence shows Madkins did so knowingly without L.D.'s consent due to there being a struggle to take off L.D.'s clothing. The evidence supports that L.D. was overcome by fear. She had been beaten, choked, and told by Madkins that he would kill her and no one would care. Then Madkins told her she could leave after she performed sexual favors for him. A reasonable juror could conclude based

14

upon this that L.D. was overcome by fear. The evidence supports a finding of guilty beyond a reasonable doubt for all of the elements of rape.

Madkins only asks this court to reweigh L.D.'s credibility and the physical evidence. That is not the function of an appellate court. Based on the record as a whole, the evidence viewed in the light most favorable to the State supports our finding that a reasonable juror could have found Madkins guilty of rape beyond a reasonable doubt.

Affirmed.