No. 93,964
STATE OF KANSAS, *Appellee,* v. RAY F. GARCIA, *Appellant.*
(169 P.3d 1069)

Opinion filed October 26, 2007.

*Elizabeth Seale Cateforis*, of Paul E. Wilson Defender Project, University of Kansas School of Law, of Lawrence, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

Nuss, J.: A jury convicted Ray F. Garcia of the rape and first-degree felony murder of P.E., a 73-year-old woman. Garcia received consecutive sentences: life in prison for the felony murder and 408 months' imprisonment for the rape. Our jurisdiction is under K.S.A. 22-3601(b)(1), a maximum sentence of life imprisonment imposed.

The issues on appeal, and our accompanying holdings, are as follows:

1. Did Garcia's prosecution for rape violate the Ex Post Facto Clause of the United States Constitution? Yes.

2. Did the district court err in allowing admission into evidence of Garcia's prior convictions of two counts of rape and one count of aggravated criminal sodomy? No.

3. Does sufficient evidence support Garcia's conviction of felony murder? Yes.

4. Do Garcia's convictions violate double jeopardy? Moot.

Accordingly, we affirm Garcia's felony-murder conviction, reverse his rape conviction, and remand to the district court with directions to vacate the rape sentence.

## FACTS

On Sunday, November 12, 1995, P.E., a 73-year-old woman, met her friend Blanche Cooper at church in Wichita. P.E. was wearing a black floral dress Cooper had given her. After church, the two women went to Cooper's home for a lunch of chicken chow mein, milk, and cherry cheesecake. P.E. left Cooper's residence at 1:30 p.m. Although P.E. stated that she would return to Cooper's house the following day for lunch, P.E. did not return. The next day Cooper went to P.E.'s apartment to look for her; police at the scene informed Cooper that P.E. was dead.

At the time, P.E. was living at the Interdale Apartments on North Broadway. Kevin Brewington lived in the apartment below P.E.'s. On Tuesday November 14, he went to check on her; the door was locked, so he retrieved a key. After again knocking, Brewington entered P.E.'s apartment to find her on the floor. P.E.'s black floral dress had been pushed up towards her neck and the heel of her left leg was up on the edge of the coffee table. Brewington went back downstairs and called 911. Detective David Alexander and EMS responded; EMS determined that P.E. was dead.

After Detective Alexander entered the apartment to secure the crime scene, he interviewed Brewington. Alexander asked Brewington if he saw anything unusual in the apartment. From outside the door of P.E.'s apartment, Brewington had observed a pair of dark-colored winter gloves on the coffee table that he did not recognize as P.E.'s. Brewington also stated that he did not recall seeing rolls of tape on the floor previously.

Detective Alexander observed a white, heavy-set, elderly female, blindfolded, lying face up, with her arms out to her side, palms down. The woman's legs were spread a couple of feet apart and her dress was pulled up to her armpits. Aside from the dress, the woman was nude. Alexander noticed what appeared to be "fresh" minor abrasions on one of her knees, her left shin, and her right toe, as well as a light bloody discharge from her mouth and vaginal area. He also observed a pair of wadded up pantyhose by the window, a pair of men's white briefs by her right shoulder, and a roll of surgical tape on the floor. On the coffee table, he observed winter gloves, masking tape, and a ceramic ashtray containing two partially smoked hand-rolled cigarettes. Alexander did not see any evidence of forced entry.

Although police processed the apartment for fingerprints, they did not find any usable impressions. Due to the state of DNA technology at the time, police were unable to retrieve DNA samples from the cigarette butts.

Dr. Marcus Nashelsky performed the autopsy. Because he observed rice, short noodles, and a portion of a red cherry in P.E.'s stomach, he concluded that she died within a few hours of eating that particular meal. He collected DNA samples from P.E.'s mouth, vagina, and rectum; no spermatozoa was found. Additionally, Dr. Nashelsky found a few small hairs or fibers on the body. He also noted numerous abrasions to P.E.'s knees. The autopsy also revealed dried blood extending downward from the opening of the vagina to the anus. The blood covered several very small abrasions or scrapes of the skin. He also found a 1/2-inch laceration on the opening of the vagina, consistent with some type of blunt force.

Dr. Nashelsky concluded that the genital injuries resulted from an assault that occurred hours before her death. He noted that P.E. had severe coronary artery disease that could have precipitated a heart attack caused by extreme stress. Dr. Nashelsky could not, however, state the specific cause of death or the mechanism of death: suffocation or heart attack from the stress of a physical assault.

Wayne Crouse was at the apartment complex on the day P.E.'s body was discovered. Crouse told police that while he and his friend Tony Erskine were talking at the apartment complex, a man named Ray rode up on a bicycle and asked if they had heard about P.E. According to both Crouse and Erskine, the man referred to her solely by her first name. Crouse described the man as white, having black hair with a little bit of grey, a mustache, no glasses, and no tattoos. The man was short—5 feet 8 inches to 5 feet 9 inches tall—and stocky, weighing approximately 180 to 200 pounds. Crouse estimated his age as late 40's to early 50's. Crouse had seen him around the apartment complex before.

Although the police followed up several leads, P.E.'s death eventually became a "cold case." Several years later Detectives Dana Gouge and Kelly Otis were assigned to review it. Gouge eventually submitted evidence for DNA testing, including the cigarette butts found in the ash tray in P.E's living room. Test results showed an unknown male profile, which was later run through CODIS, the combined DNA indexing system. The profile was matched to convicted felon Raymond Garcia. Garcia's DNA was the only DNA found on the cigarette butts.

Gouge and Otis then contacted Crouse for more information. He positively identified a photograph of Garcia as the man he saw on the bicycle whom he knew as "Ray." The detectives also contacted Erskine; however, he was not able to positively identify Garcia.

Gouge then learned that Garcia was incarcerated in the El Dorado State Correctional Facility. In August 2003, Gouge and Otis procured a search warrant to obtain DNA samples from Garcia. At the correctional facility, Gouge took buccal swabs from the inside of Garcia's mouth. A test of the swabs confirmed the CODIS information.

After execution of the search warrant, Garcia agreed to speak with the detectives. He repeatedly denied knowing P.E. Initially, he claimed he had never been at the apartment building, but later he admitted he had been there. Garcia maintained, however, that he had not been in P.E.'s apartment. When Gouge told him that his DNA was found at the scene, Garcia responded that around

the time of P.E.'s death, he went to the apartment building with a friend of his named Keith. Keith introduced Garcia to an unknown white male who performed oral sex on him. Garcia was unsure whether he ejaculated. He also stated that he smoked Marlboro and Camel cigarettes, as well as marijuana, or "creeper weed," but not hand rolled cigarettes.

The following month Garcia was interviewed again. Garcia stated that although he had been at the apartment building, he did not know P.E. Garcia acknowledged that his main mode of transportation was his bicycle and that he frequently rode past the apartment complex. Garcia also stated that a man at the apartment complex would pick up cigarette butts out of ash trays.

On January 30, 2004, Garcia was charged with rape or, in the alternative, attempted rape and felony murder—with rape and attempted rape as the underlying felony. The State later filed a motion to admit evidence of Garcia's 1997 convictions of two counts of rape and one count of aggravated criminal sodomy. The court eventually allowed admission of the evidence as proof of Garcia's intent and identity.

A jury found Garcia guilty of both felony first-degree murder and rape but acquitted him on attempted rape. Garcia received consecutive sentences: life in prison for felony murder and 408 months' imprisonment for the rape.

More facts will be provided as necessary to the legal analysis.

## ANALYSIS

Issue 1: *Garcia's prosecution for rape violated the Ex Post Facto Clause of the United States Constitution.*

At the time the crimes were committed in November 1995, the statute of limitations for rape was 5 years. K.S.A. 21-3106(4). As both parties acknowledge, the statute was amended in 2001, extending the time limitation for a charge of rape to either "the time provided by the law pertaining to such offense [5 years] *or* one year from the date on which the identity of the suspect is conclusively established by DNA testing, whichever is later." (Emphasis added.) K.S.A. 2001 Supp. 21-3106(4), (7)(a). Consequently, the amend-

ment became law only after the original 5-year statute of limitation for rape had run in mid-November 2000.

Garcia argues that K.S.A. 2001 Supp. 21-3106(7)(a) was applied to revive his time-barred prosecution for rape in violation of Article I, § 10, clause 1 of the United States Constitution: the Ex Post Facto Clause. This clause prohibits states from enacting laws with certain retroactive effects. *Stogner v. California*, 539 U.S. 607, 610, 156 L. Ed. 2d 544, 123 S. Ct. 2446 (2003). Our standard of review is de novo. See *State v. Marsh*, 278 Kan. 520, 537-40, 102 P.3d 445 (2004) (questions of both statutory and constitutional law).

In support, Garcia cites *Stogner*, 539 U.S. 607, and *State v. Nunn*, 244 Kan. 207, 768 P.2d 268 (1989). In *Stogner*, the United States Supreme Court clarified application of the Constitution's two Ex Post Facto Clauses to a criminal statute of limitations. There, Stogner was indicted in 1998 for sex-related abuse allegedly committed between 1955 and 1973 in California. At that time, a 3-year limitations period was in effect. However, in 1993, California passed a new statute allowing prosecution for sex-related child abuse where the limitations period had expired if the prosecution was begun within 1 year of the victim's report to police. Stogner moved to dismiss arguing that the previously time-barred offense was impermissibly revived in violation of the Ex Post Facto Clause. The Supreme Court "conclude[d] that a law enacted after expiration of a previously applicable limitations period violates the *Ex Post Facto* clause when it is applied to revive a previously time-barred prosecution." 539 U.S. at 632-33.

In so holding, the Court discussed why limitations statutes are important:

"Significantly, a statute of limitations reflects a legislative judgment that, after a certain time, no quantum of evidence is sufficient to convict. [Citation omitted.] And that judgment typically rests, in large part, upon evidentiary concerns—for example, concern that the passage of time has eroded memories or made witnesses or other evidence unavailable. [Citations omitted.]" 539 U.S. at 615.

Fourteen years prior to *Stogner*, the Kansas Supreme Court stated a similar rationale and result in *Nunn*:

"We . . . hold that an amendment to a criminal statute of limitations extending the time for commencement of a prosecution is remedial or procedural, not

substantive, and may be applied to crimes committed prior to the effective date of the amendment so long as the prior statute of limitations had not expired prior to the effective date of the amendment. *Of course, if the statute being amended has run on the specific crime charged, then the amendment cannot be applied to resurrect a prosecution which has already been time-barred.*" (Emphasis added.) 244 Kan. at 218.

The State acknowledges *Stogner* and *Nunn.* Nevertheless, it argues that *Stogner's* discussion of evidentiary concerns actually provides a basis for us to conclude that applying the amended statute of limitations would not violate the Ex Post Facto Clause:

"Here, however, such concerns are not present, as the amended statute of limitations at issue applies only in cases where a suspect's identity is conclusively established by DNA evidence. Thus, the instant case presents a scenario where the passage of time has actually *increased* the amount, and accuracy, of evidence available."

At least one commentator has rejected this argument based on *Stogner's* plain language: "Since *Stogner* did not carve out an exception for DNA evidence, it appears that even near-perfect reliability in linking a defendant to a crime will be insufficient to justify reviving a time-barred prosecution." Note, *Does Time Eclipse Crime? Stogner v. California and the Court's Determination of the Ex Post Facto Limitations on Retroactive Justice,* 38 U. Rich. L. Rev. 1011, 1043 (2004). We agree with the commentator.

Under the holdings of *Stogner* and *Nunn,* we conclude that application of the amended K.S.A. 21-3106 resurrects a previously time-barred prosecution and violates Article I, § 10, clause 1 of the United States Constitution. Although application of the statute to the present facts violates the Ex Post Facto Clause, the statute is not unconstitutional on its face, as Garcia asserts. Rather, as stated in *Nunn,* the statute may extend the limitations period for offenses not time barred at the effective date of the amendment. 244 Kan. at 218. In the present case, the offense was already time barred (mid-November 2000) at the amendment's effective date (July 1, 2001); Garcia was not charged until January 2004.

The State argues in the alternative that Garcia waived any claim related to the statute of limitations by failing to raise it below. The State cites *Lowe v. State,* 14 Kan. App. 2d 119, Syl. ¶ 1, 783 P.2d

1313 (1989), for the proposition that a statute of limitations defense can be waived in a criminal case by the knowing, voluntary, and intelligent acts of the defendant. See also *In re Johnson, Petitioner*, 117 Kan. 136, 230 Pac. 67 (1924) (discussing whether the statute of limitations in criminal cases must be raised as an affirmative defense; cited in *Lowe*).

In *Lowe*, defendant pleaded nolo contendere to aggravated battery. The court concluded that pursuant to K.S.A. 22-3208(4), the defendant waived the defenses available to him by pleading guilty. 14 Kan. App. 2d at 121. Nevertheless, the State asserts that the holding in *Lowe* was not limited to circumstances involving a plea agreement. While we observe that the holding specifically provided that waiver in a criminal case must be based upon the "knowing, voluntary, and intelligent acts of the defendant," 14 Kan. App. 2d at 121, the State implies that the failure of Garcia's defense counsel to raise the claim at trial was sufficient to meet this standard.

The State's arguments muddy the issue. By the time the rape charge was filed against Garcia in late January 2004, the statute of limitations already had been extended by the legislature to 1 year after his August 2003 DNA testing—to August 2004. Accordingly, the proper question is not whether he was being prosecuted outside of the statute of limitations. Under the amended statute, he clearly fell within the limitations period; therefore, the statute of limitations defense was not available to him, and case law concerning waiver of a limitations period as an affirmative defense is inapplicable. Rather, the proper question is whether the amended statute lengthening the limitations period was applied contrary to a constitutional provision, *i.e.*, the Ex Post Facto Clause, and we have held that it was.

Garcia concedes that he is raising the issue of the Ex Post Facto Clause for the first time on appeal. He asserts, however, two applicable exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal: (1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent

denial of fundamental rights. See *State v. Schroeder*, 279 Kan. 104, 116, 105 P.3d 1237 (2005).

Had the constitutional issue been previously raised, Garcia would likely not have been prosecuted for the rape charge, which resulted in a conviction and attendant sentence of 408 months' imprisonment consecutive to his life sentence for felony murder. Therefore, we conclude that at a minimum, consideration of the issue is necessary to serve the ends of justice and to prevent a denial of fundamental rights. In light of our holding that application of the amendment to revive Garcia's previously time-barred prosecution for rape violated the Ex Post Facto Clause, the conviction is reversed. See *Stogner*, 539 U.S. at 632-33 (reversing the California Court of Appeal). The reversal renders moot Garcia's rape sentencing issue based upon *Cunningham v. California*, 549 U.S. 270, 166 L. Ed. 2d 856, 127 S. Ct. 856 (2007).

Issue 2: *The district court did not err in allowing introduction into evidence of Garcia's prior convictions of two counts of rape and one count of aggravated criminal sodomy.*

Garcia next argues that the district court erred in admitting evidence of his prior convictions of rape and aggravated criminal sodomy to show his intent and identity for the present charges of felony murder and rape. Accordingly, he asserts that his Fourteenth Amendment due process right to a fair trial was denied, his convictions must be reversed, and he must be granted a new trial.

Although not raised by Garcia, we preliminarily observe that our reversal of his rape conviction does not necessarily bar rape from serving as the underlying charge for the felony murder. After we noted that in New York the completion of the underlying felony is not an essential element of felony murder, and that an acquittal of the underlying felony is not inconsistent with a conviction of felony murder, in *State v. Wise*, 237 Kan. 117, 123, 697 P.2d 1295 (1985), we held that "under our statute, K.S.A. 21-3401[b], an accused need not be prosecuted [for] or convicted of the underlying felony in order to be convicted of felony murder." This rule has recently been described as "long held." *State v. Dixon*, 279 Kan. 563, 571,

112 P.3d 883 (2005). *Cf.* K.S.A. 21-3401 ("Murder in the first degree is the killing of a human being committed . . . [b] in the commission of, *attempt to commit*, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto." [Emphasis added.]). Accordingly, evidence of Garcia's prior convictions of rape and aggravated criminal sodomy can be relevant to the sole count of the felony murder of P.E., which is based upon rape or attempted rape.

Our decision in *State v. Gunby*, 282 Kan. 38, 144 P.3d 647 (2006), provides a road map for our analysis of this evidentiary issue: When a party challenges the admission or exclusion of evidence on appeal, the first inquiry is relevance. Unless otherwise prohibited, all relevant evidence is admissible. K.S.A. 60-407(f). "Relevant evidence" is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). A material or logical connection between the asserted facts and the inference or result they are intended to establish are necessary to establish relevance. 282 Kan. at 47 (citing *State v. Lumley*, 266 Kan. 939, 950-51, 976 P.2d 486 [1999]).

*Gunby* further explained our possible standards of review:

"Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. [Citation omitted.] When the adequacy of the *legal* basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo." 282 Kan. at 47-48.

Garcia's prior convictions were admitted pursuant to K.S.A. 60-455; indeed, *Gunby* now requires that this statute govern the admissibility of any and all other crimes and civil wrongs evidence. 282 Kan. at 57. The statute states:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, *intent*, preparation, plan, knowledge, *identity* or absence of mistake or accident." (Emphasis added.)

Garcia argues that he challenges the legal basis for the admission of the evidence, *i.e.*, the statutory conditions were not met; thus, our review is de novo. See 282 Kan. at 48. But in *State v. Overton,* 279 Kan. 547, 555, 112 P.3d 244 (2005), we stated: "Overton bears the burden of establishing that the trial court abused its discretion in admitting evidence under K.S.A. 60-455, and he has failed to demonstrate such an abuse in the admission of A.D.'s testimony. See *Rucker,* 267 Kan. at 823. A.D.'s testimony proves Overton's plan, one of the facts specified in K.S.A. 60-455." Because of the way Garcia has framed his appellate argument, we agree with him on the standard of our review. As we stated in *State v. Tiffany,* 267 Kan. 495, 498, 986 P.2d 1064 (1999): " '*If* the requirements for admission of evidence of prior crimes pursuant to K.S.A. 60-455 are met, the scope of appellate review is limited to whether the trial court abused its discretion.' [Citations omitted.]" (Emphasis added.) *Cf. Koon v. United States,* 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 (1996) ("A district court by definition abuses its discretion when it makes an error of law. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.").

Under the plain and unambiguous language of the statute, evidence of prior crimes or civil wrongs cannot be admitted to prove a criminal defendant's propensity to commit the charged crime, but it can be "admissible when relevant to prove some other material fact." K.S.A. 60-455; 282 Kan. at 48. While *Gunby* clarified that the eight material facts listed in the statute are exemplary, not exclusive (282 Kan. at 56), Garcia's challenge nevertheless goes to two material facts that are listed: intent and identity.

*Gunby* also clarified that the K.S.A. 60-455 inquiry requires several steps. The court must determine that the evidence is relevant to prove a material fact. The court must also determine that the material fact is disputed. The court additionally must determine that the probative value of the evidence outweighs the potential for producing undue prejudice. Finally, the court must give a limiting instruction informing the jury of the specific purpose for admission whenever 60-455 evidence comes in. 282 Kan. at 48, 56-57. As we stated in *Gunby*: "These safeguards are designed to

eliminate the danger that the evidence will be considered to prove the defendant's mere propensity to commit the charged crime." 282 Kan. at 48.

The issue of prior crimes was initially raised in the State's motion to admit evidence of Garcia's criminal history for acts occurring on December 8, 1996. The district court eventually allowed admission of the evidence to prove intent and identity.

As a result, A.L.R.—the victim of the 1996 crimes—testified at trial about the events leading to Garcia's convictions. She stated that for some time Garcia had come to A.L.R.'s house or backyard in Wichita to talk with her husband, who worked on bicycles during his retirement; Garcia also rode a bicycle. She knew Garcia by sight, not by name. During the early morning hours of December 8, 1996, A.L.R. was asleep with her husband when she was awakened by someone brushing against her arm. After warning that he had a knife, the intruder ordered A.L.R. and her husband to cover their heads; they then covered their heads with blankets. He also demanded money. When A.L.R. told the intruder the money was in her purse, he led her to the hallway where the purse was located.

After retrieving the purse, the intruder led A.L.R. back to the bedroom. He then took off her pajama top and fondled her breasts. By this time she recognized his voice and recalled he had been at her backdoor the day before calling for her husband. Garcia then pulled down A.L.R.'s pajama bottoms and panties and told her to squat down. After she complied, he raped her with his penis. Once she returned to the bed, she pulled the blanket back over her head. After asking where they kept their tape, Garcia then bound both A.L.R. and her husband. Garcia first wrapped Christmas cloth material, then tape, around her ankles and wrapped tape around her hands and wrists. He then taped her husband's hands and feet. After removing the blanket from her face so he could bind her hands, Garcia placed a gown over her face.

A.L.R. testified that Garcia spent approximately 2 hours in her home, including time spent pulling out drawers throughout the house and otherwise searching for valuables. Before leaving, he took bills and change from her purse and even broke open several piggy banks to obtain all their coins. He also took jewelry, a camera,

a VCR, and a backpack. A.L.R. believes he took her keys because they were missing afterward. There was no visible sign of forced entry; she and her husband believed Garcia had come in through the basement door. She was 56 years old at the time of the incident; her husband was 66.

A.L.R. identified Garcia as her attacker at trial. Testing conducted by the Kansas Bureau of Investigation revealed Garcia's DNA was found on A.L.R.'s vaginal swabs. In July 1997, a jury convicted Garcia of two counts of rape and one count of aggravated criminal sodomy against A.L.R.

### Relevance and Disputed, Material Facts

Garcia argues that the facts the State sought to prove in the instant case, intent and identity, were not disputed, material facts. If they were, he also argues that the evidence of prior convictions was not relevant to prove those material facts. He correctly does not object to use of the prior convictions simply because those crimes occurred after the crimes against P.E. See *State v. Bly*, 215 Kan. 168, 176-77, 523 P.2d 397 (1974) (other offense may be admissible even if it occurred subsequent to the offense for which the defendant is being tried).

We have held that " '[m]ateriality,' for purposes of K.S.A. 60-455, contemplates a fact which has a legitimate and effective bearing on the decision of the case *and is in dispute*." (Emphasis added.) *State v. Faulkner*, 220 Kan. 153, 156, 551 P.2d 1247 (1976) (citing *Bly*, 215 Kan. at 176). Stated another way: "[T]he element or elements being considered (*e.g.*, intent, motive, knowledge, identity, etc.) must be substantially in issue in the case before a trial court should admit evidence of other crimes to prove such elements." *Bly*, 215 Kan. at 176.

Garcia first focuses on his identity as immaterial and undisputed; we disagree. Identity is a disputed, material fact because he denies being in P.E.'s apartment, much less being the perpetrator of the crimes against her. See *State v. Searles*, 246 Kan. 567, 579, 793 P.2d 724 (1990) (" 'Identity' was an issue in the present case. The disputed material fact was whether or not the defendant was the one who committed the crime."). *Cf. Bly*, 215 Kan. at 176 ("Where

a defendant admits that he committed the act and his presence at the scene of the crime is not disputed, a trial court should not admit other crimes evidence for the purpose of proving identity. The obvious reason is that such evidence has no probative value in the case").

This determination leads us to the relevance issue: whether the 60-455 evidence is relevant, *i.e.*, similar enough to the present crimes charged, to help prove identity. See *Faulkner*, 220 Kan. at 157 ("The similarity of offenses is a key factor in relevancy"; the court determines whether evidence of other crimes is relevant to prove a material fact which is substantially in issue.). As this court stated in *Bly*, 215 Kan. at 177:

"Where a similar offense is offered for the purpose of proving *identity*, the evidence should disclose sufficient facts and circumstances of the other offense to raise a reasonable inference that the defendant committed both of the offenses. . . . *There should be some evidence of the underlying facts showing the manner in which the other offense was committed so as to raise a reasonable inference that the same person committed both offenses.* As pointed out by Mr. Justice Kaul in *State v. Johnson*, 210 Kan. 288, 502 P.2d 802:

' *"The quality of sameness is important when pondering the admission of other crimes to prove identity."* ' (p. 294.) (Emphasis supplied.)"

The cases in which prior crimes have been used to prove identity have emphasized that the crimes need not be identical, only similar. *Searles*, 246 Kan. at 578 (citing *State v. Williams*, 234 Kan. 233, 670 P.2d 1348 [1983]).

Garcia argues that many of the similarities between the present case and his previous convictions "arise simply because the allegations center around a rape occurring in a victim's home." The district court found, however, both victims being bound was uncommon and suggested the same for being blindfolded. At the pretrial ruling, the district judge discussed similarities between the two cases:

"I don't profess to be an expert on the methodology of rape or the application of force during rape, but in my limited experience of over 20 years in private practice, now approaching four years on the bench, I would say in my opinion that *it is the exception rather than the rule in the force that I've seen that people are bound and blindfolded.* Certainly [P.E.], by State's Exhibit No. 4, was blindfolded, and

there is certainly evidence in the coroner's report to reach the conclusion she was bound at some point during this encounter.

"Certainly with the [A.L.R.] case, the '96 case, there was evidence and proof of binding. I think those are similarities. I think those are striking similarities." (Emphasis added.)

We agree with the district court's determination of similarity based upon binding and blindfolding. We observe that P.E. had ligature marks on her wrists. Her dress' cloth belt was found beneath her, cut in several places and containing several slip knots. Because the belt's width matched the ligature marks, police opined it had been used to restrict her movements and then was cut from her wrists. Two rolls of different kinds of tape were also found at P.E.'s murder scene. We further observe that A.L.R. was bound with wrapped cloth material and then tape was placed around her ankles and hands; tape was used around her husband's hands and feet.

Additionally, we observe that P.E. was found with a wool winter scarf tied around her head and covering her eyes. Similarly, A.L.R. and her husband were immediately told by Garcia to cover their heads, which they did with bed blankets. When Garcia later needed to move the blanket in order to bind her hands, he placed a nightgown over her face. We independently observe that Garcia warned A.L.R. that he had a knife; not only had P.E.'s dress' belt been cut in three places but also knife wounds had been found on her middle finger.

We also observe other similarities argued by the State but not addressed by the district court. Fresh abrasions were on P.E.'s knee, left shin, and right toe suggesting she had been forced to kneel; Garcia's brief characterizes the A.L.R. crimes as her being forced to kneel on the floor before and during the rape. Additionally, as Garcia acknowledged, both P.E. and A.L.R. were victimized in their own homes. Dr. Nashelsky opined that P.E.'s genital injuries resulted from an assault; she died in her living room. A.L.R. was raped in her bedroom. P.E. suffered minor abrasions and scrapes to her vaginal and perineal area, together with a vaginal bloody discharge and a ½-inch cut to the opening of her vagina

consistent with a blunt force; A.L.R.'s vagina was forcibly pene-
trated by Garcia's penis.

Furthermore, both victims appeared to have had all of their pri-
vate areas exposed involuntarily. Garcia removed A.L.R.'s pajama
bottoms and panties and let them drop to the floor; he exposed
her breasts by taking off her pajama top. P.E.'s dress was pulled
up to her armpits and revealed her body was completely nude
below. Her underwear was missing and her panty hose was found
wadded up against the window. Moreover, both P.E. and A.L.R.
were of similar ages.

We also observe that neither victims' residence showed signs of
forced entry. Moreover, Garcia knew A.L.R. because he had often
been to her house and yard; it can be inferred that Garcia knew
P.E. because the day her body was found he referred to her solely
by her first name. Also, Garcia spent approximately 2 hours in
A.L.R.'s home, including time spent pulling out drawers and oth-
erwise searching for valuables throughout. Garcia's DNA on the
two partially smoked handrolled cigarettes in P.E.'s ashtray suggest
he spent a substantial length of time there. Investigators discovered
some of P.E.'s drawers and interior doors left open, suggesting
Garcia had also spent some of his time searching for her valuables.

Moreover, keys were taken from both residences. Additionally,
Garcia took money, among other things, from A.L.R.'s home, in-
cluding all the coins from several piggy banks he broke. No money
of any kind was found in P.E.'s apartment, even though her friend,
Cooper, had given her $10 a few hours before her death.

Differences do exist between the two situations, *e.g.*, A.L.R.'s
husband was at home during the attack that occurred early in the
morning, while P.E. lived alone and the attack occurred before her
evening meal. However, the "quality of sameness" was sufficient
to make the evidence relevant to prove identity. See *Searles*, 246
Kan. at 578-79. ("In the case at bar, the prior crimes are sufficiently
similar to the present offense so as to raise a reasonable inference
that Searles committed all the offenses. The test of relevancy has
been met."); K.S.A. 60-401(b) (Evidence is relevant if it has any
tendency in reason to prove a material fact.).

Because we have determined that the evidence was admissible at least for the disputed, material fact of "identity," addressing the alternate basis of "intent" is moot.

## Probative Value v. Prejudice

Garcia argues that even if intent and identity were disputed, material facts, the evidence should not have been admitted because the risk of prejudice outweighed the probative value. In support, he cites *Bly's* discussion of possible prejudice:

"First, a jury might well exaggerate the value of other crimes as evidence proving that, because the defendant has committed a similar crime before, it might properly be inferred that he committed this one. Secondly, the jury might conclude that the defendant deserves punishment because he is a general wrongdoer even if the prosecution has not established guilt beyond a reasonable doubt in the prosecution at hand. Thirdly, the jury might conclude that because the defendant is a criminal, the evidence put in on his behalf should not be believed. Thus, in several ways the defendant may be prejudiced by such evidence." 215 Kan. at 174.

See *Gunby*, 282 Kan. at 48-49.

This court stated in *Searles*, 246 Kan. at 579: "As *Breazeale* pointed out, the evidence should not be admitted if the potential for natural bias and prejudice overbalances the contribution to the rational development of the case. 238 Kan. at 723. In the present case, it did not. The evidence of the prior crimes was not merely cumulative. The evidence of the prior crimes was an important and natural part of the whole trial."

Clearly the evidence of Garcia's previous crimes was prejudicial because "[a]ll evidence that is derogatory to the defendant is by its nature prejudicial to the defendant's claim of not guilty. Evidence that actually or probably brings about the wrong result under the circumstances of the case is *'unduly prejudicial.'*" (Emphasis added.) *State v. Clark*, 261 Kan. 460, 477, 931 P.2d 664 (1997). However, this part of the evidentiary analysis is reviewed for abuse of discretion. See *State v. Meeks*, 277 Kan. 609, 618, 88 P.3d 789 (2004) (Our standard of review of otherwise relevant evidence which arguably should have been excluded after this particular weighing of probative value versus risk of unfair prejudice is abuse of discretion.). Discretion is abused only when no reasonable per-

son would take the view adopted by the trial court; the burden of proof is on the party alleging that the discretion is abused. 277 Kan. at 618.

Like the *Searles* case, the district court necessarily found that the evidence's probative value as to identity outweighed prejudice. Certainly like *Searles,* the evidence of the prior crimes was not merely cumulative but an important and natural part of the whole trial. We cannot say that no reasonable person would take the district court's view. Further, the court properly instructed the jury that the prior crimes evidence could only be considered for the purpose of proving intent and identity, which helps to dampen any prejudicial effect. See, *e.g., State v. Lane,* 262 Kan. 373, 391, 940 P.2d 422 (1997) (Absent any contrary evidence, it must be assumed that the jury followed this instruction, thus minimizing prejudice to the defendant.).

Because we have determined the evidence was properly admitted, the State's argument of harmless error and Garcia's argument that his Fourteenth Amendment due process rights to a fair trial were violated are moot.

Issue 3: *Sufficient evidence supports Garcia's conviction of felony murder.*

Garcia next argues that his convictions of rape and felony murder were based upon insufficient evidence. Given our holding on issue 1 to reverse the rape conviction as a matter of law and direct the vacation of its sentence, whether sufficient evidence supports that conviction is now moot.

We observe at the outset that, as previously noted in issue 2, even with the reversal of the rape conviction and vacation of its sentence, a conviction of felony murder based upon rape does not necessarily fail as a matter of law. Accordingly, we must proceed to determine whether sufficient evidence exists to support the conviction of felony murder which, as here, is based upon rape or its attempt.

This court faced a similar issue in *State v. Beach,* 275 Kan. 603, 67 P.3d 121 (2003). There, the jury convicted Beach of felony murder, whose underlying felony was aggravated robbery, but ac-

tually acquitted her on the separate charge of aggravated robbery. Beach argued that because of the acquittal of aggravated robbery, there was insufficient evidence to support her conviction of felony murder based upon that charge as the underlying crime. Characterizing the problem of one of inconsistent jury verdicts, this court held in *Beach*, 275 Kan. 603 Syl. ¶ 4: "[A]n acquittal of direct responsibility for the underlying felony does not vitiate the conviction of felony murder based on the underlying felony." Accordingly, the court proceeded to determine whether sufficient evidence supported the murder charge which was based upon aggravated robbery. It reviewed the evidence, 275 Kan. at 614-15, and later concluded:

"The question in this case . . . is whether after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. We conclude that the jury rationally could have found Beach *participated in the underlying felony of aggravated robbery.* That the jury acquitted Beach of aggravated robbery independent of the felony murder does not impair our conclusion." (Emphasis added.) 275 Kan. at 622.

Because the felony-murder charge was based upon an aggravated robbery in which a rational jury could have found that Beach participated, the *Beach* court affirmed the felony-murder conviction. 275 Kan. at 628.

We acknowledge that the issue in *Beach* was not identical to the one in the present case. There, the defendant was acquitted of the felony separate from the felony-murder charge. Here, the defendant was convicted of the felony separate from the felony-murder charge, but that conviction was reversed as a matter of law. Consequently, an argument could be made that because the underlying felony, rape, was barred by the Ex Post Facto Clause *as a matter of law*, then the accompanying murder charge based upon that same crime is similarly barred as a matter of law. However, because felony-murder charges can be brought with or without charges for the underlying felony, we regard a failure to so prosecute, or an acquittal, as the functional equivalent of a bar to bringing the underlying charges because of the Ex Post Facto Clause. We observe, for example, that there is a statute of limitations for rape (5 years

per K.S.A. 21-3106[4] and [7]), but none for murder, *e.g.*, felony murder. See K.S.A. 21-3106(1). Accordingly, a felony-murder charge based upon a rape which had occurred more than 5 years earlier should not be time barred.

This leads us to the question of the sufficiency of the evidence to support Garcia's felony-murder conviction. According to Jury Instruction No. 7, the underlying felony was rape or attempted rape. As did the court in *Beach*, we observe that our standard of review is well known:

" 'When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Burhans*, 277 Kan. 858, 871, 89 P.3d 629 (2005).

In order to prove first-degree felony murder, the jury was instructed that the State had to show that the killing of P.E. was committed during Garcia's commission of or an attempt to commit rape. See K.S.A. 21-3401(b). The jury was also instructed that rape required showing, among other things, that (1) Garcia had sexual intercourse with P.E.; and (2) the act of sexual intercourse was committed without the consent of P.E. under circumstances where she was overcome by force or fear. See K.S.A. 21-3502. "Sexual intercourse" is defined as "any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse." K.S.A. 21-3501(1).

The jury was also correctly instructed, although it did not convict on this separate crime, that to establish the crime of an attempt to commit rape, the State had to show that Garcia performed an overt act toward the commission of the crime of rape, that he did so with the intent to commit the crime of rape, and that he failed to complete commission of the crime of rape. It was additionally instructed that an overt act necessarily must extend beyond mere preparations made by the accused and must sufficiently approach consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense. Mere preparation is insufficient to constitute an overt act.

Garcia specifically asserts that the State failed to present sufficient evidence of sexual intercourse, particularly penetration. This assertion ignores, however, that the felony of attempted rape also may serve as the basis for the felony murder, and an attempt does not require penetration. An attempt requires only an overt act which is beyond mere preparation. Such evidence is ample here. P.E. was found blindfolded, lying face up on the floor of her apartment. Her legs were spread a couple of feet apart, and her dress was pulled up to her armpits. Aside from the dress, she was nude. Evidence also revealed her wrists had been bound, and her panty hose had been wadded up and cast aside. The police opined that she had been bound with her dress belt to restrict her and it had then been cut from her wrists. She had fresh minor abrasions on her knee, her left shin, and her right toe, indicating she had been forced to kneel. Dried blood extended downward from the opening of her vagina to the anus, covering several very small abrasions or scrapes of the skin. A ½-inch laceration was found on the opening of the vagina, consistent with some type of blunt force. The coroner essentially opined she had been sexually assaulted.

Garcia also specifically asserts that the State failed to prove that he was the perpetrator. In support, he points out that no DNA was found on P.E.'s body and no seminal fluid was recovered from the scene. Garcia distinguishes the facts of the present case from his previous conviction for the rape of A.L.R., where DNA taken from A.L.R.'s body indicated Garcia had raped her. He argues that any evidence against him is "purely circumstantial."

Contrary to Garcia's claim, a conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Holmes*, 278 Kan. 603, 632, 102 P.3d 406 (2004). Testimony established that two partially smoked handrolled cigarettes containing only Garcia's DNA were found in an ashtray in P.E.'s apartment near her body. Their presence suggests their smoker had been in the apartment for a considerable amount of time, certainly long enough to commit or attempt a rape. Garcia also changed his story to law enforcement, first telling them he had never been in the apartment complex and then admitting he had. He also admitted he had been in P.E.'s apartment complex around the time of the

murder. Shortly after her body had been found, he asked Crouse and Erskine if they had heard about P.E., calling her by her first name.

Additionally, the details of the 60-455 evidence of his 1996 crimes against A.L.R,. for which he was convicted, demonstrate they "were committed in a similar manner so as to raise a reasonable inference that the same person who committed the crime committed the other" against P.E. See *Bly,* 215 Kan. at 178.

After reviewing all the evidence, viewed in a light most favorable to the State, we are convinced that a rational factfinder could have found Garcia guilty beyond a reasonable doubt of attempted rape and felony murder based upon that attempt. See *Burhans,* 277 Kan. at 871. Sufficient evidence exists to support Garcia's conviction of felony murder.

Issue 4: *Garcia's double jeopardy argument is moot.*

Finally, Garcia argues that his two convictions are multiplicitous and violate double jeopardy. Because in issue 1 we reversed his rape conviction, the question of double jeopardy is moot.

The felony-murder conviction is affirmed, the rape conviction is reversed, and we remand to the district court with directions to vacate the rape sentence.