CORRECTED OPINION

NOT DESIGNATED FOR PUBLICATION

No. 117,459

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER HITCHCOCK,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion filed December 14, 2018.
Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Christine M. T. Ladner*, assistant county attorney, *Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN, J., and ROBERT J. FREDERICK, District Judge, assigned.

PER CURIAM: Christopher Hitchcock appeals his convictions for one count of rape, nine counts of aggravated indecent liberties with a child, three counts of aggravated criminal sodomy, two counts of lewd and lascivious behavior, two counts of violation of a protective order, one count of sexual exploitation of a child, and one count of breach of privacy, arguing error in the admission of certain testimony. We disagree with Hitchcock

1

that the district court erred in the admission of the testimony. Accordingly, we affirm all of Hitchcock's convictions.

## FACTUAL AND PROCEDURAL BACKGROUND

Hitchcock and K.S. were in a relationship for 12 years. They met when K.S.'s daughter, Z.S., was an infant. When Z.S. was three years old, Hitchcock and K.S. had a daughter, P.H. They lived in various places in Salina over the years including a brick house, a blue house, and a white house.

On the evening of Friday, August 21, 2015, when Z.S. was 12 years old, K.S. heard Hitchcock's phone ring after he had gone to bed. She picked up the phone but did not answer the call. Instead, she "decided to be nosy" and went through his phone. While doing so, she discovered two inappropriate photos of Z.S. In one photo, Z.S. was standing in the bathroom, completely nude. The other photo was an image of Z.S.'s crotch in tight-fitting shorts.

Using her phone, K.S. took photos of the images on Hitchcock's phone. That same night, K.S. called her daughter. Although K.S. did not mention the photos, she asked Z.S. if there was anything inappropriate going on between her and Hitchcock. Z.S. said no.

On Saturday morning, K.S. called a friend, told her about the images she had found on Hitchcock's phone, and asked if she and the girls could stay with her for a while. The friend told her mother about the photos. The friend's mother, who was a mandated reporter, called the police.

That same day, K.S. confronted Hitchcock. At first, Hitchcock denied having any photos on his phone. Later he claimed he found the photos on his son's phone. Although Hitchcock's contact with his son, S.H., over the years was rare—consisting of a total of

2

three face-to-face visits and a phone call every two years—S.H. had visited that weekend. K.S. told Hitchcock that she wanted to talk to S.H.'s mother, but Hitchcock would not give K.S. the contact information. In response, K.S. demanded that Hitchcock call S.H.'s mother himself. Subsequently, both S.H.'s mother and a local sheriff confronted S.H. about the photos attributed to him. S.H. denied taking the photos.

On Sunday, a police officer arrived at the Hitchcock home. Hitchcock still blamed S.H. for the photos. During the course of the investigation, the officer seized the phones of both K.S. and Hitchcock.

Z.S. had been staying with her father over the weekend, as she did every weekend. When Z.S. returned with her father, Hitchcock frantically ran up to the car and said his son had taken photos of Z.S. undressing and that he had transferred the photos from his son's phone to his own phone.

When K.S. told Z.S. about the photos on Hitchcock's phone and that Hitchcock claimed he did not take them, Z.S. remarked, "[I]f they're on his phone he's the one who took them." Z.S. then revealed to her mother that Hitchcock had touched her butt at some point in time. She said when she threatened to tell her mother about the touch, he responded, "[Y]ou ain't got nothing to tell." Shortly thereafter, Z.S. left the house and went to stay with her father. K.S. took P.H. and moved in with a friend.

Jody Dysinger, a child protection specialist with the Kansas Department for Children and Families, went to Z.S.'s school to do a minimal facts interview. When Dysinger asked if Z.S. knew why she was there, Z.S. said, "Chris was being inappropriate. . . . Chris was taking inappropriate pictures of me and touching me at night." According to Z.S., Hitchcock would come into her room at night and touch her butt and her crotch. When she would wake up, he would pretend that he was just tucking her into bed. Hitchcock would touch her "probably under" her clothing. Z.S further

3

relayed that she told Hitchcock she was going to tell her mother, and he responded that there was nothing to tell. Z.S. also stated that, on at least one occasion, she awoke and Hitchcock's finger was inside her vagina. She said she did not recall Hitchcock ever touching her chest. Once she saw a phone in her bathroom and noted that it looked like it was recording. She stopped it from recording and set it back down. Finally, she said that Hitchcock began touching her when she was in the sixth grade.

Sergeant Sarah Cox conducted a recorded forensic interview of Z.S. Because the parties did not add any of the audio or video recordings to the record on appeal, there is only minimal information about the interview. During this interview, Z.S. stated that Hitchcock began touching her when she was in the fourth or fifth grade. She also noted that she saw Hitchcock's penis seven or eight times and that he would masturbate. She said Hitchcock touched her breasts about three times but denied that Hitchcock ever touched her on her butt.

The State charged Hitchcock with 20 counts of aggravated indecent liberties with a child, an off-grid felony; 1 count of rape, an off-grid felony; 3 counts of aggravated criminal sodomy, an off-grid felony; 7 counts of lewd and lascivious behavior, a severity level 9 person felony; 1 count of sexual exploitation of a child, an off-grid felony; 1 count of breach of privacy, a severity level 8 person felony; and 57 counts of violation of a protective order, a class A person misdemeanor.

At trial Z.S. testified that Hitchcock began touching her when they lived in the brick house when she was 9 or 10 years old; he always touched her vagina over her clothing; if she woke up, he stopped; and he touched her once or twice a week.

Z.S. testified that, at the blue house, the contact progressed to touching her vagina underneath her pajamas and underwear, and the touching became more frequent, occurring three or four days a week.

4

Z.S. further testified that, at the white house, Hitchcock always touched her under her clothing; the frequency of the touching increased once again to four or five days a week; she saw his penis hanging out of the slit in his boxer shorts; he masturbated while he touched her vagina; he also touched her breasts; he put his finger in her vagina more than once; and he touched his mouth to her vagina more than once. Z.S. said Hitchcock threatened to ground her if she told anyone about the sexual abuse; he would buy her things to keep her silent; and he told her there was nothing to tell and no one would believe her. Z.S. also testified about a time when she found Hitchcock's phone on a shelf in the bathroom. She put a towel over it in case it was on. At another point, Z.S. testified that she found his phone on the counter in the bathroom but it was not on.

Z.S. acknowledged during her trial testimony that she had testified at the preliminary hearing that she never saw Hitchcock touch his penis and that he never touched her chest. At trial, she also testified that Hitchcock never touched her butt in a sexual way. Finally, she said she never told anyone about the sexual abuse because she did not know if people would believe her and did not know how her mother would react because her mother loved Hitchcock.

The State also introduced evidence that Hitchcock had a 1988 juvenile adjudication for attempted aggravated sexual battery. Supplemental thereto, the State introduced the admissions against interest that Hitchcock made relating to his 1988 conduct through the testimony of Officer Darrell Fiske.

At trial, Hitchcock denied the allegations. He testified he thought he was being framed by K.S. because he had addiction issues, was bipolar, and would become violent by breaking and throwing things and yelling. He admitted that he subjected his family to mental abuse. He also admitted that he lied about finding the photos on his son's phone and that he threw his son "under the bus." He also admitted that he was scared and thought it would go away if he told K.S. that he handled it.

5

Prior to trial, the State filed a motion for the admission of the 1988 juvenile adjudication and the facts surrounding the crime as propensity evidence under K.S.A. 60-455. At the hearing, Hitchcock argued the evidence should be excluded because the juvenile adjudication was not probative of anything and it was prejudicial. He further argued the crimes were not similar, that the adjudication was 30 years ago, and the prior crime was committed by a child against another child.

Citing to *State v. Prine*, 297 Kan. 460, 303 P.3d 662 (2013), the trial court granted the State's motion and allowed admission of Hitchcock's juvenile adjudication and any uncharged conduct relating to the 1988 allegations, finding the evidence relevant to show propensity. In doing so, the trial court recognized that it did not need to engage in an analysis of whether the prior conduct was substantially similar to the current crime or modus operandi. Rather, the issue was whether the probative value of the evidence was substantially outweighed by the risk of unfair prejudice. The trial court found the evidence was probative of the prior sexual attraction to children, the age disparity between Hitchcock and the victims, the ongoing pattern of the abuse, and that Hitchcock took advantage of the access he had to the victims until he was caught. Noting that all propensity evidence is prejudicial, the trial court also stated that it could not imagine a way for the government to introduce propensity evidence that was any less prejudicial.

Before trial, Hitchcock also moved to suppress Fiske's testimony, alleging Hitchcock had been subjected to a custodial interrogation in 1988 without being given warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The trial court denied this motion, finding the interview was a noncustodial interrogation.

At trial, Hitchcock renewed his objections to the admission of the journal entry of judgment from Hitchcock's juvenile case and to the testimony of Fiske. At that time, the trial judge expanded on his reasoning for denying the motion to suppress, saying, "I find

that the motion to suppress is not a remedy available to an interview from 1988 in which a defendant stipulated and was adjudicated guilty of the offense, and that the purpose of that motion to suppress or any suppression as to prohibit police conduct and it would not be appropriate in this situation."

From the evidence presented at the motion to suppress hearing and the trial, we are given to understand that in 1988 Fiske was asked to investigate a possible indecent liberties with a child offense. At the time, Hitchcock was 12 years old. During the investigation, Fiske went to Hitchcock's house and gave him, his sister, and his father a ride to the police station. Hitchcock's father agreed to allow Fiske to interview Hitchcock without a parent present. Fiske had already interviewed one of the victims. Fiske was not in uniform and did not drive a marked police car, but he did have a badge and a sidearm. The police department was less than 1/2 mile from Hitchcock's house. Fiske interviewed Hitchcock in his office, rather than in a formal interview room, and a social worker was present during the questioning. Hitchcock was not in handcuffs or shackles. Fiske did not remember whether he told Hitchcock he did not have to talk to him, though he was sure that he did tell Hitchcock's father that Hitchcock did not have to speak with him. Fiske never told Hitchcock that he could leave at any time. Fiske also did not give Hitchcock any *Miranda* warnings. Up to that point in time, Hitchcock apparently did not have any prior involvement in the criminal justice system. While the officer suspected a crime had occurred, he just wanted to get Hitchcock help. Finally, Fiske did not intend to charge Hitchcock at the time he was being interviewed. After the interview, Fiske told Hitchcock's father they would be contacted about counseling, but he did not arrest Hitchcock or take him into custody at that time.

During the interrogation, Hitchcock explained that he played a "humping game" with his sister, age seven, and a neighbor girl, age six. With both of them clothed, he would ask the girls to lay down on the ground and then he would get on top of them and do an "up and down motion." He rubbed his penis against the girls' vagina area. He had

an erection during the game. He played this game many times and, eventually, the game progressed. He pulled down the girls' pants and panties, covered their faces, pulled his penis out of his pants, and rubbed his penis between the girls' legs and did an up and down motion. He ejaculated on the floor. On at least one occasion, he attempted to penetrate his sister's vagina. Hitchcock believed that sooner or later one of the girls would tell about the humping game and he would get in trouble.

Before trial in the present case, the State dismissed several counts and ultimately submitted to the jury nine counts of aggravated indecent liberties with a child, one count of rape, three counts of aggravated criminal sodomy, two counts of lewd and lascivious behavior, one count of sexual exploitation of a child, one count of breach of privacy, and two counts of violation of a protective order. The jury convicted Hitchcock on all counts. Thereafter, the court sentenced him to three consecutive life sentences, each with a hard 25 years.

Hitchcock timely appeals.

I.      THE DISTRICT COURT DID NOT ERR BY ADMITTING EVIDENCE OF HITCHCOCK'S PRIOR JUVENILE ADJUDICATION.

Hitchcock contends the district court erred by admitting evidence of his 1988 juvenile adjudication because the acts he committed in 1988 were not sufficiently similar to the present allegations against him. Hitchcock preserved this issue for appellate review by renewing his objection to the admission of the journal entry of judgment from Hitchcock's juvenile case at trial.

K.S.A. 2017 Supp. 60-455(d) provides that "evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and may be considered for its bearing on any matter to which it is relevant and probative."

8

"Evidence is relevant if it has a 'tendency in reason to prove any material fact.' K.S.A. 60-401(b). . . . Relevant evidence is both: (1) material, *i.e.*, the fact has a legitimate and effective bearing on the decision of the case and is in dispute; and (2) probative, *i.e.*, has '"any tendency in reason to prove"' the fact. [Citations omitted.]" *State v. Smith*, 299 Kan. 962, 969, 327 P.3d 441 (2014).

In sex offense cases, propensity evidence is material. *State v. Bowen*, 299 Kan. 339, 349, 323 P.3d 853 (2014). We review whether evidence is probative for abuse of discretion. 299 Kan. at 348. A judicial action constitutes an abuse of discretion if (1) no reasonable person would agree with the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

As noted by the trial court, our Supreme Court has recognized "the 'modern psychology of pedophilia' suggests that propensity evidence may possess probative value for juries, because 'sexual attraction to children and a propensity to act upon it are defining symptoms of this recognized mental illness.'" *Prine*, 297 Kan. at 465. In addition, prior acts that are similar to the charged allegations are probative of the defendant's propensity to commit the charged acts. See *Bowen*, 299 Kan. at 349.

Here, the trial court did not abuse its discretion in determining Hitchcock's prior sexual abuse of his sister and neighbor was probative of Hitchcock's propensity to commit the acts alleged by Z.S. Each allegation involved sexual acts toward young girls. Each began with over-the-clothes touching and progressed to under-the-clothes touching and then to penetration or attempted penetration. Each continued until Hitchcock was caught. Hitchcock had easy access to all of the victims, and each time there was an age disparity between him and the girls.

After finding the evidence relevant (and thereby necessarily finding the evidence probative), the trial court next considers whether the probative value of the evidence of

9

prior sexual misconduct is substantially outweighed by its prejudicial impact. See *State v. Remmert*, 298 Kan. 621, 628, 316 P.3d 154 (2014), *disapproved of on other grounds by State v. Jolly*, 301 Kan. 313, 342 P.3d 935 (2015); *State v. Lowrance*, 298 Kan. 274, 291, 312 P.3d 328 (2013). We review a district court's decision for abuse of discretion. *Remmert*, 298 Kan. at 628.

When conducting such a balancing test, the trial court should consider:

"'1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence. When analyzing the probative dangers, a court considers: 1) how likely it is such evidence will contribute to an improperly-based jury verdict; 2) the extent to which such evidence will distract the jury from the central issues of the trial; and 3) how time consuming it will be to prove the prior conduct. [*United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998)].'

"To further assist . . . in analyzing probativeness . . . , the [following] enumerated considerations which may influence the court's analysis [include] (1) the similarity of the prior acts and the charged acts, (2) the time lapse between the other acts and the charged acts, (3) the frequency of the prior acts, (4) the occurrence of intervening events, and (5) the need for evidence beyond the defendant's and alleged victim's testimony. *Guardia*, 135 F.3d at 1331." *United States v. Benally*, 500 F.3d 1085, 1090-91 (10th Cir. 2007); see *Bowen*, 299 Kan. at 350; see also *Prine*, 297 Kan. at 476-78 (listing cases interpreting Federal Rules 413, 414, and 415, upon which K.S.A. 60-455[d] was modeled).

A panel of this court cited all of these factors in *State v. Boysaw*, 52 Kan. App. 2d 635, 649-51, 372 P.3d 1261 (2016), *rev. granted* 306 Kan. 1321 (2017), and affirmed the admission of evidence of a sexual assault conviction from 27 years prior in a prosecution for aggravated indecent liberties with a child despite differences in the victims' ages. 52 Kan. App. 2d at 649-51. The differences in the children's ages in *Boysaw* align with the differences in age in this case (nine and six). While *Boysaw* is not yet binding, logic tells

10

us that some similarity between the prior allegations and the current allegations does go to the probative value of the evidence. Thus far, our Supreme Court has yet to mechanically evaluate each factor and has not required trial courts to do so. See, e.g., *State v. Dern*, 303 Kan. 384, 394, 362 P.3d 566 (2015).

Hitchcock contends the district court erred by not applying the factors listed in *Boysaw*. However, Hitchcock did not object below to the trial court's findings as inadequate. As a result, we can presume the trial court found all facts necessary to support its judgment. See *Dern*, 303 Kan. at 394. That said, Hitchcock argues the absence of one specific factor: the lack of similarity between the acts he committed in 1988 and the present allegations against him. In the current case, he argues he never got on top of Z.S., attempted penile penetration, ejaculated, or discussed ejaculation with Z.S.

What Hitchcock really demands is something more than similarity. He essentially argues that the allegations need be identical to be admissible under K.S.A. 2017 Supp. 60-455(d). Prior caselaw completely rebuffs this notion in pointedly holding that the allegations need not be identical but are sufficient if they are similar. See *Bowen*, 299 Kan. at 349-50. Moreover, propensity evidence need not be so strikingly similar in pattern or so distinct in method of operation as to be a signature, as needed to show plan or modus operandi. Some likeness is sufficient. See *Prine*, 297 Kan. at 480.

Prine was convicted of rape, aggravated criminal sodomy, and aggravated indecent liberties for abuse of a six-year-old girl while babysitting. Prine touched his victim's vagina with his fingers, tongue, and stomach. At trial, the State introduced evidence that Prine had sexually abused his daughter when she was four or five years old by placing her on top of his bare body while she was naked from the waist down and touching his penis to her vagina. The State also introduced evidence that 20 years prior, when Prine was 17 years old, he abused his sister beginning when she was 4 or 5 years old. He touched her vagina with his fingers, touched his penis to her vagina, put his mouth on her

11

vagina, and placed his penis in her mouth. At the time of Prine's first trial, the current K.S.A. 2017 Supp. 60-455(d) did not exist, and the trial court admitted the prior crimes evidence to show "plan." To show plan, the evidence needed to be so strikingly similar in pattern or so distinct in method of operation as to be a signature. 297 Kan. at 464.

The Kansas Supreme Court reversed Prine's convictions and remanded the case for retrial because "although [the previous victims] were the same gender as [the current victim] and were abused at approximately the same age, and although some of the activities defendant engaged in with each victim bore some likeness, the behaviors were not so unusual or identical as to constitute a signature." 297 Kan. at 464. Before retrial, the Legislature amended K.S.A. 60-455, adding the current subsection (d). L. 2009, ch. 103, § 12. On retrial, the prior crimes evidence was again admitted to show plan. The Supreme Court again found that was error but held the error was not reversible because the evidence was admissible under K.S.A. 2009 Supp. 60-455(d) as propensity evidence and the probative value of the evidence outweighed the threat of undue prejudice. 297 Kan. at 480.

*Prine* is directly on point to the case at hand. Just like here, the State in *Prine* introduced evidence that the defendant had sexually abused his sister over 20 years earlier when the defendant was a juvenile. Also like here, the prior allegations included sex acts that Prine was not accused of in his current case—that he placed one of the girls on top of his body and touched his penis to her vagina and that he put his penis in the mouth of one of the girls. Despite these differences, the Supreme Court found the prior sexual misconduct evidence was admissible as propensity evidence. Following *Prine*, it can safely be said that, as to Hitchcock, the prior allegations against Hitchcock are sufficiently similar to the current allegations so as to be admissible.

The trial court aptly observed that all evidence against a defendant is prejudicial. See *State v. Garcia*, 285 Kan. 1, 18, 169 P.3d 1069 (2007). Citing to *Prine* extensively,

12

the trial court analyzed the four factors relevant to the probative/prejudice balancing test and found the material fact of whether Hitchcock committed the charged crimes was disputed because Hitchcock's defense was a general denial. The trial court found the State presented strong evidence proving the prior allegations and could not avail itself of less prejudicial evidence. The trial court also found the prior allegations were probative to show propensity because of the similarities to the present allegations and the allegations showed a sexual attraction to children. Hitchcock's prior sexual misconduct and resulting adjudication as a juvenile offender was unlikely to contribute to an improper jury verdict or distract from the central issues at trial. See *Dern*, 303 Kan. at 395. Therefore, the trial court did not abuse its discretion by finding the probative value of the propensity evidence outweighed its potential for prejudice, and the trial court did not err by admitting evidence of Hitchcock's prior crime.

II.     HITCHCOCK HAS ABANDONED ANY ARGUMENT THAT THE DISTRICT COURT ERRED IN DENYING HIS MOTION TO SUPPRESS.

Hitchcock next argues that the statements he made to police in 1988 should have been suppressed in *this* case because he was "in custody" during the interrogation without the benefit of a *Miranda* warning. Hitchcock preserved this issue for appellate review by renewing his objection during trial to Fiske's testimony based on his pretrial motion to suppress and obtaining a standing objection after the district court expanded on its reasoning for denying the motion.

The complicating factor in this case, and one the district court astutely pointed out, is that in 1988 Hitchcock *stipulated* to the offense and was adjudicated guilty. Whether Hitchcock can challenge anything related to that conviction, including his admissions against interest, is questionable at best. The district court found he could not. Hitchcock presents no argument or cites any caselaw that challenges the district court's finding in this regard. Instead, he only focuses on the constitutionality of the confession. Issues not

adequately briefed are deemed waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018). Accordingly, we find Hitchcock has abandoned any claim that the trial court erred in admitting the details of his confession.

In conclusion, we pause to note that, consistent with the district court's holding, stipulations are judicial admissions. See *State v. Mburu*, 51 Kan. App. 2d 266, 272, 346 P.3d 1086, *rev. denied* 302 Kan. 1017 (2015). "[A] defendant's stipulation precludes a defendant from asking the trial judge to suppress evidence because a defendant has agreed the evidence can be admitted and considered. *State v. Kelly*, 295 Kan. 587, 591, 285 P.3d 1026 (2012)." *Mburu*, 51 Kan. App. 2d at 275. Moreover, the law is clear that a defendant generally cannot appeal from a conviction to which he or she enters a guilty plea. See K.S.A. 2017 Supp. 22-3602(a); *State v. Harp*, 283 Kan. 740, 743, 156 P.3d 1268 (2007). So we find nothing inconsistent about the district court's ruling here that Hitchcock cannot challenge the constitutionality of his confession in this action. But we need not decide the issue today in light of Hitchcock's failure to challenge the district court's conclusion.

Affirmed.